J-A12033-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JOHN ANTHONY LASORDA | : | |
| | : | |
| Appellant | : | No. 447 EDA 2023 |

Appeal from the Judgment of Sentence Entered September 7, 2022
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0001016-2020

BEFORE: PANELLA, P.J.E., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED JULY 9, 2024**

Appellant, John Lasorda, appeals from the judgment of sentence entered in the Court of Common Pleas of Montgomery County on September 7, 2022, after a jury trial. Appellant was convicted of rape - forcible compulsion, statutory sexual assault, sexual assault, aggravated indecent assault - lack of consent, aggravated indecent assault - forcible compulsion, aggravated indecent assault - complainant less than 16 years of age, indecent assault - forcible compulsion, indecent assault - lack of consent, indecent assault - complainant less than 16 years of age, terroristic threats, false imprisonment, and corruption of minors. After a careful review, we affirm.

The relevant facts and procedural history have been aptly summarized by the trial court as follows:

_____

[*] Former Justice specially assigned to the Superior Court.

In March 2019, following his release from a six (6) year state prison sentence, Defendant moved in with his sister Tiffany Bowman and her then fiancé, Tom Cirafasi, at their residence in Gilbertsville, PA. This residence was located next door to [the victim's family]. The two families were very close and celebrated holidays and birthdays together in addition to frequently visiting each other's homes. Through this close relationship, Defendant and the victim became acquainted. Although Defendant was twenty-seven (27) years old and the victim was only thirteen (13), they both discovered that they had similar interests and ended up spending some of their free time together.

In early April 2019, Ms. Bowman and Mr. Cirafasi went away to the mountains for the weekend, but Defendant did not accompany them. At the beginning of the weekend, the victim and Defendant initially played video games together in the victim's bedroom until Defendant told the victim that he had to go feed his family's bearded dragon (a type of lizard). The victim had previously watched the bearded dragon and asked Defendant if he needed any assistance to which Defendant responded in the affirmative. The victim received her mother's approval to go next door with Defendant and helped him feed the bearded dragon at approximately 8:45 p.m. Following the feeding, the victim was getting ready to leave and Defendant proceeded to grab her by the arm and would not let go. Defendant pulled the victim's arm with so much force that her shoulder popped out of place. The victim instructed Defendant to stop but he responded "not to worry about that right now." Defendant subsequently picked the victim up and placed her over his shoulder. The victim attempted punching and kicking Defendant in an effort to get out of his grasp, but she was unsuccessful. Defendant proceeded to carry the victim to a couch in the dining room and kept his arm over her chest and his hand on her shoulder. The victim continued to try to escape from Defendant's grip and he instructed her to stop moving. Eventually, the victim stopped fighting due [to] her realization that she was overpowered and her attempts to escape would be futile. Defendant also instructed the victim that if she did not stop resisting, he would kill her.

Defendant used his free arm to pull down the victim's shorts and underwear and began to rub her vagina with two (2) fingers for an unknown amount of time. Defendant eventually stopped and used the same hand to pull down his shorts and rub his penis around the victim's vaginal area. Defendant proceeded to place

his penis into the victim's vagina and engaged in vaginal intercourse. During his thrusting motions, Defendant informed the victim that it "felt good." Defendant continued to engage in this activity for approximately two (2) minutes and, upon completion, subsequently stood up and left the residence. Following Defendant's departure, the victim stood up from the couch, cried and went to the bathroom to wash her face so that no one would be able to determine that she had been crying. The victim proceeded to return to her house and observed that Defendant was already inside. Upon her arrival, the victim began to play video games again with Defendant at which point he instructed her not to tell anyone what had just transpired. Once Defendant left, the victim placed the shorts that she was wearing at the top of her closet so that she wouldn't be able to see them and also washed her underwear several times.

The following day, the victim contacted her friend, Bruce Sztuba, and informed him of what had occurred. That same day, the victim, her mother and Defendant were all present at a bonfire on the Andrews' property. During this bonfire, Defendant shared information with the victim's mother that she had told him in confidence. [The information the victim told Defendant that he relayed to her mother was that the victim was sexually active with her boyfriend.] The victim's mother subsequently confronted her about this revelation and the victim denied the truthfulness of this information. Sometime later, the victim admitted to her mother that the information which Defendant had shared at the bonfire was actually correct.

Initially the victim informed her mother of another event involving Defendant where he had touched her thigh under her shorts. This incident occurred after the rape and the victim told her mother about this incident instead of the rape to see how she would react to this type of news in light of the relationship between the two families and the fact that her "life would be changed." The victim's mother was upset by this news. A period of time later, the victim disclosed to her boyfriend, Storm, that she had been raped by Defendant knowing that Storm would divulge this information to the victim's mother. Storm did eventually relay this information and the victim's mother later approached her daughter regarding this revelation. The victim confirmed that the information was true and told her mother the details. The [victim's family] subsequently informed Ms. Bowman and Mr. Cirafasi of what they had learned and several days later,

on June 10, 2019, made a report to the Douglass Township Police Department. Authorities filed a criminal complaint on December 4, 2019, and later arrested Defendant on January 17, 2020. The parties subsequently filed a multitude of pre-trial motions which the court addressed.

On April 26, 2022, the Commonwealth filed a *Motion in Limine* to Exclude Evidence of the Victim's Sexual Conduct (the "Commonwealth's Motion"). On May 5, 2022, Defendant filed a reply to the Commonwealth's Motion and a Motion to Pierce the Rape Shield Law ("Defendant's Motion"). In this motion Defendant requested the admission of testimony regarding (1) the victim's disclosure to Defendant that she was sexually active with her boyfriend, (2) Defendant's communication of this information to the victim's mother, and (3) the victim's initial denial and subsequent admission to the subject matter of this disclosure. Defendant's Motion claimed this information was essential to demonstrate the victim's motivation to fabricate the allegations and to call the victim's credibility into question. On May 13, 2022, the court granted the Commonwealth's Motion and denied Defendant's Motion, holding that no testimony regarding the victim's sexual conduct could be introduced during trial unless the Commonwealth elicited testimony or introduce evidence pertaining to statements made by Defendant regarding the victim's prior sexual conduct. The order provided that it could be modified by further order of court in light of the fact that the parties did not have full information as to whether the victim really was sexually active with her boyfriend at that time or whether Defendant had fabricated this allegation.

Prior to trial, as part of its continuing duty to disclose, the Commonwealth provided confirmation that the victim was in fact sexually active with her boyfriend at the time of the rape. On June 8, 2022, immediately prior to trial and in light of this new information, Defendant asked for a reconsideration of the Court's ruling with respect to the Commonwealth's and Defendant's Motions. Towards this end, the court modified its order by allowing testimony that "[the victim] told [Defendant] something in confidence. Defendant then shared; the information with [the victim's] mother shortly after the alleged rape. [The victim's] mother then spoke to the victim about the information. [The victim] initially denied that the information was correct. [The victim] subsequently admitted the information was correct. [The

victim] reported the alleged rape approximately six to eight weeks after [the victim] had the conversation with the mother."

From June 8 through June 9, 2022, the court held a jury trial in which the jury found Defendant guilty of the charges referenced above. On September 7, 2022, the court imposed an aggregate sentence of one-hundred forty-four (144) to two-hundred eighty-eight (288) months of imprisonment (twelve (12) to twenty-four (24) years) and three (3) years of probation to run consecutive to the expiration of parole. The court also ordered Defendant to register as a Tier III offender under 42 Pa.C.S.A. § 9799.14 of Subchapter H of the Sex Offender Registration and Notification Act ("SORNA"). Pursuant to 42 Pa.C.S.A. § 9799.15 of SORNA, Defendant's classification as a Tier III offender required him to register as a sex offender for life and to comply with all of the requirements associated with this registration. On September 16, 2022, Defendant filed timely post-sentence motions. On November 7, 2022, following a hearing, the court found Defendant to be a sexually violent predator pursuant to 42 Pa.C.S.A § 9799.24. On January 10, 2023, the court denied Defendant's post-sentence motions.

Tr. Ct. Op. at 1-5.

On February 3, 2023, Defendant filed a timely notice of appeal. This appeal followed. Appellant raises two issues for our review:

I. Whether the trial court erred and denied Appellant his constitutional rights to confrontation and a fair trial, in precluding Appellant from presenting evidence at trial that the complainant was previously sexual active with her boyfriend, a fact which Appellant reported to the complainant's mother within a day of the alleged rape, where such evidence was offered to undermine the complainant's credibility and to show her motive for fabricating the rape allegation against appellant?

II. Whether the verdict, as to all counts, was against the weight of the evidence in light of the irreconcilable contradictions between witnesses' testimony regarding material facts?

Appellant's Br. at 4.

We first address Appellant's claim that the defense should have been permitted to cross-examine the victim about Appellant's disclosure of the victim's sexual activity with her boyfriend to her mother. This claim implicates the Pennsylvania Rape Shield Statute, which provides:

> (a) General rule.— Evidence of specific instances of the alleged victim's past sexual conduct, past sexual victimization, allegations of past sexual victimization, opinion evidence of the alleged victim's past sexual conduct, and reputation evidence of the alleged victim's past sexual conduct shall not be admissible in prosecutions of any offense listed in subsection (c) except evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence.

18 Pa.C.S. § 3104.

This Court has recognized that an exception to section 3104 exists when the evidence tends "to directly exculpate the accused by showing that the alleged victim is biased and thus has a motive to lie, fabricate, or seek retribution" because such evidence affects the defendant's constitutional right to confront and cross-examine witnesses. *Commonwealth v. Fernsler*, 715 A.2d 435, 439 (Pa. Super. 1998) (quoting *Commonwealth v. Guy*, 686 A.2d 397, 400 (Pa. Super. 1996)). The trial court must then examine the evidence to determine whether the probative value outweighs its prejudicial effect and whether there is an alternative way to prove the motive to fabricate. *Commonwealth v. Black*, 487 A.2d 396, 401 (Pa. Super. 1985).

Here, the trial court recognized Appellant's theory that his breaking of the victim's trust served as motivation for her to fabricate the allegations that

Appellant had raped her, "either as a form of retribution or as means to divert the scrutiny and admonition she supposedly received from her parents as a result" of Appellant's disclosure of the victim's sexual activity. Tr. Ct. Op. at 7.

However, the trial court determined that there was an alternative way to prove the motive to fabricate:

> Here, the question of whether the victim was sexually active with her boyfriend at the time was irrelevant on the issue of whether Defendant had raped her. What was relevant was the fact that Defendant had betrayed the victim's trust by disclosing something to her mother that the victim had told Defendant in confidence. By crafting its directive for the defense to only focus upon the general nature of this betrayal rather than the salacious details of the disclosure, the jury could still infer that the victim was pressing the charges against Defendant in retaliation. The court's exclusion of non-probative and highly prejudicial evidence of the victim's prior sexual conduct did nothing to hamper Defendant's defense that the victim filed the charges against him in retaliation for Defendant violating the trust that had existed between the victim and himself.

Tr. Ct. Op. at 9-10.

We agree. Appellant relies on several cases for the proposition that the Rape Shield law cannot serve as a basis for precluding him from admitting evidence relevant to the victim's credibility. *See* Appellant's Br. at 27-30 (citing *Commonwealth v. Palamore*, 195 A.3d 291 (Pa. Super. 2018); *Commonwealth v. Fernsler*, 715 A.2d 435 (Pa. Super. 1998); *Commonwealth v. Northrip*, 945 A.2d 198, (Pa. Super. 2008); and *Commonwealth v. Black*, 487 A.2d 396, (Pa. Super. 1985)). However, those cases are distinguishable because in those cases, the court found "no

alternative means by which Appellant could present evidence to establish [the victim's] motive to fabricate." ***Commonwealth v. Northrip***, 945 A.2d 198, 205 (Pa. Super. 2008) (citing ***Commonwealth v. Black***, 487 A.2d 396, 401 (Pa. Super. 1985). Here, the trial court found an alternative way to allow in evidence of the victim's motive to fabricate the rape by letting the jury hear that Appellant had betrayed her trust. Thus, the trial court did not err because it allowed Appellant to challenge the victim's motive and credibility while excluding evidence of the victim's sexual activity.

Appellant further claims that the court violated his Sixth Amendment Confrontation Clause rights by precluding him from introducing evidence that the victim was sexually active with her boyfriend at the time, and that this was the nature of the disclosure Appellant made to the victim's mother. Appellant's Br. at 24-25.

The Sixth Amendment to the United States Constitution ensures that during a criminal prosecution, "the accused shall enjoy the right to . . . be confronted with the witnesses against him [and] to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. Appellant's assertion of a Confrontation Clause violation presents an issue of law. Our scope of review is plenary and our standard of review is de novo. ***Commonwealth v. Abrue***, 11 A.3d 484, 487 (Pa. Super. 2010), appeal denied, 21 A.3d 1189 (Pa. 2011).

> [T]he Rape Shield Law may not be used to exclude relevant evidence showing witness bias or attacking a witness' credibility. Phrased differently, the Rape Shield Law violates the

Confrontation Clause when it seeks to prohibit admission of evidence related to witness bias and/or credibility.

**Palmore**, 195 A.3d at 295 (internal citations and punctuation marks omitted).

However,

The right to present relevant testimony is not without limitation. The right may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. We have explained, for example, that trial judges retain wide latitude to limit reasonably a criminal defendant's right to cross-examine a witness based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. . . . It is only where the truth determining process is not forwarded by the exclusion of past sexual history that the Rape Shield Law and the Confrontation Clause may not be reconciled. Under these relatively rare circumstances, as this Court has previously recognized, Rape Shield laws, if rigidly construed, could impermissibly encroach upon a defendant's right to confront and cross-examine witnesses which is secured by the United States and Pennsylvania Constitutions. In such rare cases the Rape Shield Law must bow to the need to permit an accused an opportunity to present genuinely exculpatory evidence.

**Commonwealth v. Wall**, 606 A.2d 449, 456-57 (Pa. Super. 1992) (internal

citations and punctuation marks omitted).

On this point, the trial court stated:

Here, the truth determining process was still forwarded despite the exclusion of the victim's past sexual history. As discussed above, Defendant was still able to introduce evidence related to the victim's motivation to fabricate the rape allegations. The victim's sexual history did not factor at all on the ultimate issue of whether Defendant raped her and the introduction of evidence regarding this topic would have only served to harass or embarrass the victim. Thus, the court's refusal to pierce the rape shield did not violate Defendant's rights under the confrontation clause.

Tr. Ct. Op. at 11.

We agree that Appellant's rights were not violated because the lower court's limitation still allowed Appellant to present his desired theory of the case and desired line of cross-examination of the victim. Additionally, the record reveals that the jury heard on multiple occasions that the victim at first lied about the truthfulness of the matter disclosed when her parents confronted her about it. **See** N.T., 6/8/22, at 120-21 (victim testifying that she lied to her mom about what Appellant had disclosed); N.T., 6/8/22, at 150 (victim's mother testifying that victim lied at first but later admitted the truth of the matter); N.T. 6/9/22, at 53-54 (Appellant's trial counsel's closing statement pointing out that the victim lied about Appellant's disclosure). Thus, the defense was sufficiently able to call the victim's credibility into question, and his Confrontation Clause rights were not violated.

Appellant's second issue is a challenge to the weight of the evidence. To begin, we recognize that,

> our standard of review for a weight-of-the-evidence claim is an abuse of discretion. As we have often reminded appellants, "An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence." **Commonwealth v. Windslowe**, 158 A.3d 698, 712 (Pa. Super. 2017). . . .
>
> "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." **Commonwealth v. Santos**, 176 A.3d 877, 882 (Pa. Super. 2017). To mount an abuse-of-discretion attack against the trial

- 10 -

court's determination that its guilty verdicts were not so against the weight of the evidence as to shock that court's own conscience, [an appellant must] . . . demonstrate how the trial court's ruling overrode the law, was manifestly unreasonable, or the product of bias, prejudice, ill-will or partiality.

***Commonwealth v. Rogers***, 259 A.3d 539, 541 (Pa. Super. 2021), appeal denied, 280 A.3d 866 (Pa. 2022) (emphasis omitted). A weight-of-the-evidence claim "concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed." ***Commonwealth v. Charlton***, 902 A.2d 554, 561 (Pa. Super. 2006).

Specifically, Appellant argues that the testimony at trial was so conflicting and uncertain as to material facts regarding the date of and circumstances surrounding the rape that the verdict shocks one's sense of justice. Appellant's Br. at 37. Appellant alleges that the victim's testimony was contradicted by the testimony of the victim's brother and of her friend, Mr. Sztuba. Appellant further argues that there was no physical evidence that a rape had occurred. Appellant's Br. at 38-42.

Regarding any inconsistencies in the trial testimony, the trial court stated:

> Defendant identifies several minor contradictions and inconsistencies in the victim's testimony which he claims would compel the conclusion that the verdict was against the weight of the evidence. Specifically, Defendant cites to the victim's brother's testimony on cross-examination at trial in which he stated that there was never any time that he, the victim, and Defendant played video games in the victim's room when Ms. Bowman and Mr. Cirafasi were not home. (N.T. Trial by Jury - Volume 1, 6/8/22, at 132-133). Defendant also cites to the victim's brother's statement to Mission Kids which was introduced as evidence at trial in which the brother indicated that Defendant went back to

- 11 -

his home unaccompanied by the victim after they had played video games on the night of the rape. (*Id.* at 136). In this statement, the victim's brother also maintained that several minutes later he walked with the victim to the residence next door and spoke with Ms. Bowman and Mr. Cirafasi, who were actually home at the time and not traveling. (*Id.*).

The victim's brother, however, testified on direct examination that Defendant played video games with the victim on the night of the rape for about twenty minutes before Defendant and the victim left to go to Mr. Cirafasi's and Ms. Bowman's home. (*Id.* at 131). Thus, some of the victim's brother's testimony was corroborative of the victim's testimony and some was contradictory. It was within the sole province of the jury whether to believe all, part or none of the victim's testimony in light of these conflicts. *See Commonwealth v. Cramer*, 195 A.3d 594, 600 (Pa.Super. 2018) (holding the fact-finder has the responsibility of "resolving contradictory testimony and questions of credibility."). Here, the jury resolved the inconsistencies among these testimonies as it saw fit and determined that some of the confusion inherent in the testimony of a child who was twelve (12) at the time of the event did not negatively impact the credibility of the victim. It is notable that the victim's mother also corroborated the victim's testimony when she testified that the victim, the victim's brother and Defendant were all playing video games in the victim's bedroom on the night of the rape and the victim and Defendant eventually went to Defendant's house to feed the bearded dragon. (N.T. Trial by Jury - Volume 1, 6/8/22, at 146).

Defendant next cites to the fact that the victim testified that her family had a spare key to Mr. Cirafasi's and Ms. Bowman's house and she used this key to enter the residence when she went with Defendant to feed the bearded dragon. Defendant identifies testimony from Ms. Bowman which indicated that Defendant had a key to the residence and asserts that it was questionable as to why the victim would have had to use the spare key on the night of the rape when she accompanied Defendant. (N.T. Trial by Jury - Volume 2, 6/9/22, at 29). Again, it was within the sole province of the jury whether to believe the victim's testimony in light of this alleged conflict. The victim could have simply had trouble recalling this minor detail and there were also perfectly innocuous reasons as to why the victim may have used the spare key on the night in question including the possibility that Defendant did not have his

house key on his person. The jury chose to assign the requisite amount of weight to this *de minimis* alleged discrepancy and determined that it did not negatively impact the victim's credibility. **See McCloskey,** [835 A.2d 801 (Pa. Super. 2003)]*, supra*.

Defendant next cites to Mr. Sztuba's testimony in which he recalled that the victim had informed him that the rape had occurred at a party and not while she was alone with Defendant at his residence as she had stated in her testimony. (N.T. Trial by Jury - Volume 2, 6/9/22, at 10). Defendant further highlights Mr. Sztuba's testimony indicating that Defendant asked her to look out the window prior to raping her and not while she was getting ready to gather her belongings as she had testified to. (**Id.** at 9-10). It was within the sole province of the jury whether to believe the victim's testimony in light of these slight variances. **See McCloskey, supra**. The main body of Mr. Sztuba's testimony still corroborated the fact that the victim told him about the incident sometime after it happened and identified Defendant as the perpetrator. The jury chose to assign the requisite amount of weight to these small identified variances and found that they were not significant enough to negatively impact the victim's credibility.

Defendant also incorporates the absence of any DNA evidence on the victim's shorts into his weight claim. Specifically, Defendant highlights that the testimony indicated the victim did not wash her shorts after the rape but subsequent testing on these shorts revealed that they did not contain a DNA profile matching Defendant's profile. (N.T. Trial by Jury – Volume 1, 6/8/22, at 127-28). The Pennsylvania Superior Court has previously rejected similar weight arguments based on a purported lack of physical evidence. **See Commonwealth v. Diaz**, 152 A.3d 1040, 1047 (Pa.Super 2016), *appeal denied*, 641 Pa. 682, 169 A.3d 544 (2017) (determining that the trial court did not abuse its discretion in denying the defendant's weight claim as "the lack of corroborating physical evidence does not undermine the victim's testimony, found to be credible by the jury."). Additionally, there is a long standing recognition that "the uncorroborated testimony of a sexual assault victim, if believed by the trier of fact, is sufficient to convict a defendant, despite contrary evidence from defense witnesses." **Id.** (internal citations omitted). Here, despite the absence of corroborating physical evidence, the jury, as it was

permitted to do, found the victim's testimony to be credible and Defendant's weight claim fails in this respect. ***See id***.

Tr. Ct. Op. at 14-17.

We discern no abuse of discretion. After review, the record supports the trial court's determination that the jury's verdict was not against the weight of the evidence despite minor contradictions. The verdict did not shock the conscience of the court, and Appellant did not demonstrate how the trial court's ruling overrode the law, was manifestly unreasonable, or the product of bias, prejudice, ill-will or partiality. Further, regarding the precise date the rape occurred, the trial court observed:

> Lastly, Defendant cites to the uncertainty surrounding the victim's insistence that the rape occurred on April 6, 2019, which was a Saturday. Specifically, Defendant asserts that the victim's testimony indicated that the rape took place the night before the bonfire in which Defendant informed the victim's mother that she was sexually active. Defendant contends this would have placed the date of the bonfire as having taken place on April 7, 2019, which was impossible in light of text messages dated April 7, 2019, between the victim's mother and Ms. Bowman (N.T. Trial by Jury - Volume 2, 6/9/22, at 22-25 - Defense Exhibit 5) in which the victim's mother refers to the bonfire as having occurred "last night" (April 6, 2019). Defendant further alleges that to the extent the victim meant to say that the rape occurred on Friday, April 5, 2019 and still insisted that Ms. Bowman and Mr. Cirafasi were not present during the rape due to having traveled to the mountains, the testimony presented by Ms. Bowman demonstrated that she and Mr. Cirafasi had left for the mountains on April 6, not April 5. (N.T. Trial by Jury - Volume 2, 6/9/22, at 19). Defendant further focuses upon Ms. Bowman's photograph of a camper traveling on a roadway posted to social media on April 6, which Ms. Bowman's testimony indicated was a photograph she took as she was traveling behind Mr. Cirafasi on their way to the mountains on April 6. (***Id.*** at 19-21 - Defense Exhibit 4). Defendant concludes there was no evidence presented at trial to support the finding that the victim was raped on April 5 or 6, 2019.
> . . .

- 14 -

Here, despite the uncertainty surrounding the precise date, the victim's testimony regarding the details of the rape was neither tenuous nor speculative. Further, in her testimony, the victim only stated she "believed" the rape occurred on April 6, 2019, but stated that she "knew" it was on a weekend at the very beginning of April. (N.T. Trial by Jury - Volume 1, 6/8/22, at 91). The Commonwealth did not have the burden of proving the precise date the rape occurred and as such, the Commonwealth's failure to establish the exact date would not render the jury's verdict against the weight of the evidence. ***See Groff***, [548 A.2d 1237 (Pa. Super. 1988)], ***supra***. To the extent that Defendant utilizes Ms. Bowman's testimony to challenge the Commonwealth's theory that the rape likely occurred April 5 rather than April 6, the jury was free to find Ms. Bowman's testimony not to be credible and resolve any inconsistencies in the Commonwealth's favor. ***See McCloskey, supra***.

Additionally, with respect to the photograph of the trailer Ms. Bowman posted to social media on April 6 which she allegedly took while traveling to the mountains on that date, there was no definitive evidence presented that Ms. Bowman actually took the picture on that particular date. (***See generally*** N.T. Trial by Jury - Volume 2, 6/9/22, at 29-31). It is entirely possible that Ms. Bowman took the photograph while traveling to the mountains on April 5, and did not post them to social media until the following day. Further, it is notable that in the April 7 text conversation between the victim's mother and Ms. Bowman which Defendant cites to in support of his claim that the rape also could not have occurred on April 6, the victim's mother states "I missed talking with you! Friday [April 5] and yesterday [April 6] drove me crazy. I was so happy when you texted me the heart last night." (N.T. Trial by Jury - Volume 2, 6/9/22, at 23-25 - Defense Exhibit 5 at Pg. 2). This exchange could be interpreted to mean that Ms. Bowman was away on April 5, which directly contradicts her testimony that she did not leave for the mountains until April 6. Therefore, the evidence presented by the defense does not preclude the conclusion that the rape could have occurred on April 5, and in fact, the evidence at trial indicates that the rape most likely did occur on April 5. The victim's testimony that it was her belief that the rape instead occurred on April 6 does not render the jury's verdict against the weight of the evidence. The victim was a child when this occurred and may not have had a true sense of specific dates. ***See Groff, supra***. The Commonwealth is entitled to leeway with respect to proving the specific date and

- 15 -

presented evidence that would allow a jury to conclude that the rape occurred within the general timeframe (early April 2019) identified by the victim.

Tr. Ct. Op. at 17, 18-19.

We conclude the trial court did not abuse its discretion in denying Appellant's challenge to the weight of the evidence. ***Rogers, supra***. We note the jury was free to determine the weight to be given to the testimony. To the extent Appellant requests that we re-weigh the evidence and assess the credibility of the witnesses presented at trial, we decline to do so as it is a task that is beyond our scope of review. ***See Commonwealth v. Collins***, 70 A.3d 1245, 1251 (Pa. Super. 2013) (stating that "[a]n appellate court cannot substitute its judgment for that of the finder of fact") (quotation omitted)).

We also agree with the trial court that it was the province of the jury to resolve any inconsistencies surrounding the date. The trial court cites ***Commonwealth v. Groff***, 548 A.2d 1237 (Pa. Super. 1988). In that case, the prosecution would have been time barred by the statute of limitations unless the appellant committed the offense on or after a date in 1984. ***Id.*** at 1247. The Commonwealth produced circumstantial evidence that the crime occurred in 1985 while the defense argued that if any crime occurred, it was in 1983. There we said, "The jury was uniquely qualified to resolve this factual dispute." ***Id***. Further, our Supreme Court has stated, "In general, the Commonwealth need not prove that the crime occurred on the date alleged in the indictment, except where the date is an essential issue in the case, e.g., where the defendant presents an alibi defense." ***Commonwealth v. Young***,

748 A.2d 166, 182 (Pa. 1999). In the present case, the date of the rape was not an essential element in the case. Accordingly, we find no merit to Appellant's weight of the evidence claim.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/9/2024